UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DON R. CLARK, JR.; | ) | |
| ADONIS H. CLARK; | ) | |
| SHERRIE CLARK-TORRENCE; | ) | |
| ASHLEY BOUREIMA MOUROU; and | ) | |
| A.C., a minor through her mother and Next | ) | |
| Friend NECOLE FISHER, individually and as | ) | |
| the surviving children of Decedent, DON | ) | |
| CLARK, SR., | ) | Cause No.: 4:21-cv-788 |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI; | ) | |
| THOMAS STRODE, in his individual | ) | |
| capacity; | ) | |
| JOHN JONES, in his individual capacity; | ) | |
| NICHOLAS MANASCO, in his individual | ) | |
| capacity; | ) | |
| JAMES WURM, JR., in his individual | ) | |
| capacity; | ) | |
| BRANDON MOORE, in his individual | ) | |
| capacity; | ) | |
| RONALD A. MUELLER, in his individual | ) | |
| capacity; | ) | |
| JOSHUA BECHERER, in his individual | ) | |
| capacity; | ) | |
| RONALD ALLEN, in his individual capacity; | ) | |
| BENNIE BLACKMON, in his individual | ) | |
| capacity; | ) | |
| DANIEL BOOK, in his individual capacity; | ) | |
| MATTHEW TESREAU, in his individual | ) | |
| capacity; | ) | |
| JAMES ZWILLING, in his individual | ) | |
| capacity; | ) | |
| MARK SEPER, in his individual capacity; | ) | |
| GLENNON FRIGERIO, in his individual | ) | |
| capacity; | ) | |
| JOSEPH BUSSO, in his individual capacity; | ) | |
| JON LONG, in his individual capacity; | ) | |
| DANIEL CORA, in his individual capacity; | ) | |
| | ) | |

1

TIMOTHY BOYCE, in his individual        )
capacity;                               )
MICHAEL FLATLEY, in his individual      )
capacity;                               )
CURTIS BURGDORF, in his individual      )
capacity; AND                           )
SCOTT AUBUCHON, in his individual       )
capacity,                               )
                                        )
          Defendants.                   )

## COMPLAINT

1.      Don Clark, Sr. was sleeping in his home moments before he was executed by members of the St. Louis Metropolitan Police Department.

2.      Don Clark was a beloved father, grandfather, Army veteran, and resident of the City of St. Louis. At age 63 in 2017, he suffered from a range of health issues that left him hard of hearing, unable to see clearly, and dependent on a cane for mobility. He moved to 4023 California Avenue so that he would have a home for his youngest daughter.

3.      In February of 2017, Defendant Thomas Strode sought an unlawful "no knock" search warrant to search Mr. Clark's home. Defendant Strode falsified information, used boilerplate language, and lied about his surveillance, allowing him to secure the warrant without probable cause. Defendant Strode and other Defendant Officers then created a plan and executed the "no knock" warrant, resulting in Defendant Nicholas Manasco shooting Mr. Clark to death after he was jarred awake by the sounds of a long bang from a  diversionary device detonating in his home and St. Louis Metropolitan Police Department officers breaking down his door. Defendant City of St. Louis's policies and customs were the moving force behind Mr. Clark's horrific last moments and all the Defendant Officers' conduct leading up to them.

2

4.     Plaintiffs Don R. Clark, Jr., Adonis H. Clark, Sr., Sherrie Clark-Torrence, A.C., by and through Next Friend Necole Fisher, and Ashley Boureima Mourou, the surviving children of the late Mr. Clark, file this suit against the Defendants and state as follows:

## PARTIES

5.     At all times pertinent hereto, the decedent, Don Ray Clark, Sr. ("Mr. Clark") was a citizen of the United States and a resident of the State of Missouri.

6.     Plaintiff Don Ray Clark, Jr. ("Don, Jr.") is a citizen of the United States and a resident of the State of Missouri.

7.     Plaintiff Adonis H. Clark is a citizen of the United States and a resident of the State of Illinois.

8.     Plaintiff Sherrie Clark-Torrence is a citizen of the United States and a resident of the State of Missouri.

9.     Plaintiff Ashley Boureima Mourou is a citizen of the United States and a resident of the State of Missouri.

10.     Plaintiff A.C., a minor, through her mother and Next Friend Necole Fisher, is a citizen of the United States and a resident of the State of Missouri.

11.     Plaintiffs are the surviving natural children of Mr. Clark, and bring this action pursuant to 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and Missouri statutes governing wrongful death actions, sections 537.080, RSMo. 2018, *et seq*.

12.     Defendant City of St. Louis, Missouri is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City's primary law enforcement agency is the St. Louis

3

Metropolitan Police Department ("SLMPD"), which is organized under, and overseen by, the City's Department of Public Safety. The City's Public Facilities Protection Corporation ("PFPC") of the City of St. Louis insures the SLMPD and City against all claims for damages.

13.    Defendant Thomas Strode is employed as a police officer and detective with the SLMPD. He failed to conduct a sufficient investigation and used false and misleading allegations to obtain the "no knock" search warrant that directly caused the killing of Mr. Clark. At all times relevant to the subject matter of this litigation, Defendant Strode was acting under color of state law in his capacity as police officer for the City of St. Louis.

14.    Defendant John Jones is employed as a sergeant with the SLMPD. He helped Detective Strode plan the execution of the "no knock" search warrant that resulted in Mr. Clark's death, briefed the officers involved, and supervised the execution of the "no knock" warrants. At all times relevant to the subject matter of this litigation, he was acting under color of state law in his capacity as sergeant for the City of St. Louis.

15.    Defendant Nicholas Manasco is employed as a police officer with the SLMPD. He shot and killed Mr. Clark. At all times relevant to the subject matter of this litigation, he was acting under color of state law in his capacity as police officer for the City of St. Louis.

16.    Defendants James Wurm, Brandon Moore, Ronald Mueller, Joshua Becherer, Ronald Allen, Bennie Blackmon, Daniel Book, Matthew Tesreau, James Zwilling, Mark Seper, Glennon Frigerio, Joseph Busso, Jon Long, Daniel Cora, Timothy Boyce, Michael Flatley, Curtis Burgdorf, and Scott Aubuchon (hereinafter, along with Defendants Manasco and Jones, collectively referred to as "Defendant Officers") are employed as police officers with the SLMPD. They all took part in the execution of the search warrant that resulted in the killing of Mr. Clark.

4

At all times relevant to the subject matter of this litigation, they were acting under color of state law in their capacity as police officers for the City of St. Louis.

17.     At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

18.     All of the individual Defendants are persons as defined by 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

19.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.

20.     Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiffs' claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

21.     Venue is proper under 28 U.S.C. § 1391(b) because all of the events alleged herein occurred within this district at the time of the events giving rise to this litigation.

22.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis, and Plaintiffs and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

23.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. § 1367.

24.     Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## FACTS

### *Don Clark, Sr.*

25.     Don Clark, Sr. was born on August 11, 1953, and, at 63 years of age, the veteran suffered from several health conditions, including diabetes, poor eyesight, poor hearing, and an

inability to straighten his arms. He also had swollen limbs, which required him to use a cane to walk.

26.     On February 21, 2017, Mr. Clark had a doctor's visit. He was no longer driving due to his poor eyesight and other health conditions, so his son and namesake, Don, Jr., would usually pick Mr. Clark up and take him to the doctor.

27.     During his almost daily visits, Don, Jr. ensured his father properly took the 10 different prescribed medications necessary to treat and care for his illnesses and helped him with household chores that Mr. Clark could not complete on his own.

28.     Mr. Clark also received weekly visits from a home healthcare provider, but it was his son, Don, Jr., who he relied on almost daily to help him meet his basic needs.

29.     However, on February 21, 2017, Don, Jr. had to work so Mr. Clark had to take the bus to his doctor's visit. A solo trip to the doctor required extra time because Mr. Clark did not have someone to help him navigate transportation, bus connections, finding his way to the doctor's office, and checking in at the doctor's office; taking the bus sapped any extra energy from Mr. Clark to make the trip.

30.     When he made it back home later that day after the doctor's visit, Mr. Clark told Don, Jr. by phone that he was looking forward to going to sleep after an eventful day.

31.     Mr. Clark had recently moved to 4023 California after living with his daughter, Sherrie Clark-Torrence.

32.     He wanted a place he could call home for his youngest daughter, A.C., who was eight years old at the time.

33.     When Mr. Clark moved into his home at 4023 California, he gave the only bedroom to his daughter so she could have a space to call her own. He set up his own bed in the front room, across from the front door.

34.     Mr. Clark generally went to bed early in the night, around 8:00 PM or earlier.

35.     On California Avenue, neighbors called him "Pops" and described Mr. Clark as a quiet, peaceful man who kept to himself.

36.     He was a veteran of the United States Army and previously owned a private security company.

37.     Mr. Clark had told his family members and home healthcare provider about how worried he was about crime in his neighborhood.

38.     Living alone and infirm, Mr. Clark would often put screws into the door before going to bed, an effort for extra security from the risk of violence he knew waited outside.

39.     The night of February 21, 2017, unbeknownst to Mr. Clark, officers with SLMPD's Special Weapons And Tactics ("SWAT") Team would serve three "no knock" search warrants on his street.

40.     While he was sound asleep, a SWAT team of more than 17 officers separated into two "stacks" and simultaneously executed the "no knock" warrants at 4025 California and 4029 California by ramming the doors down, detonating diversionary devices inside, and rushing into the home with weapons drawn.

41.     Immediately after executing those warrants, the officers regrouped and over 17 fully armed officers converged on Mr. Clark's house at 4023 California in one long "stack."

42.     Mr. Clark, who suffered from significant hearing loss, remained fast asleep.

43.     Without announcing themselves as police, the officers rammed Mr. Clark's door in, jarring Mr. Clark awake.

44.     At no point did the intruders identify themselves as police.

45.     At no point did the intruders give instructions, such as to put his hands up.

46.     Instead, after banging the door down, the unknown intruders lobbed a diversionary device into his home.

47.     The device detonated, sending a loud bang and flash of light through the room and disorienting him, especially given his limited eyesight.

48.     Within moments, multiple intruders rushed into his home.

49.     Still, at no point did the intruders identify themselves as police or give Mr. Clark directions.

50.     Without a warning, one of the intruders — Defendant Nicholas Manasco — shot a barrage of bullets from an assault rifle.

51.     At least nine bullets entered Mr. Clark's body, nearly ripping his forearm from his elbow joint.

52.     Mr. Clark fell face down on the floor beside his bed.

53.     Blood collected under his body from the numerous gunshot wounds.

54.     Defendants Manasco and James Zwilling stood over Mr. Clark with guns pointed while other officers ran by, entering into the rest of his home.

55.     Neither Defendants Manasco and Zwilling nor the officers who ran by ever called for help.

56.     The officers never tried to stanch the blood.

57.     Mr. Clark tried to speak, but all that came out was an unintelligible mumble.

8

58.     After crucial minutes had passed, Defendant Scott Aubuchon called for Emergency Medical Services ("EMS"), but Mr. Clark later died from his wounds.

59.     Upon information and belief, Mr. Clark was unarmed when Defendant Manasco began shooting him, never shot at the officers, nor did anything that would give any reason to believe that he was an immediate threat to the Defendant Officers or the public.

### *Search Warrant and Investigation*

60.     Defendant Officers were on California Avenue that day because of Defendant Thomas Strode.

61.     On February 13, 2017, Defendant Strode applied for a search warrant for addresses at 4025 and 4029 California Avenue in south St. Louis.

62.     On February 15, 2017, Defendant Strode applied for an additional warrant for 4023 California Avenue.

63.     Defendant Strode used identical affidavits attached to the warrants for 4023 California, 4025 California, and 4029 California, falsely characterizing Mr. Clark as a criminal and guilty by association.

64.     In his affidavit, Defendant Strode knowingly included false allegations that Mr. Clark had sold illegal drugs and harbored both illegal drugs and illegal firearms in his home. These allegations were attributed to confidential informants.

65.     Upon information and belief, Defendant Strode lied about the existence of the alleged reliable confidential informants or, in the alternative, Defendant Strode knew the informants' allegations about Mr. Clark's engagement in criminal activity to be false from his own limited investigation and observations.

66.     Mr. Clark did not store any drugs in his home and had never been convicted of a crime.

67.     In his affidavit, Defendant Strode lied about "observ[ing] foot and vehicle traffic consistent with narcotic trafficking activity" in Mr. Clark's home.

68.     Throughout the affidavit, Defendant Strode falsely attributed activities happening at 4025 California and 4029 California to Mr. Clark's home.

69.     For example, Defendant Strode wrote that "[i]ndividuals would approach the residences at 4023 California, 4025 California, and 4029 California and enter inside for a brief period of time (5-10 minutes) then exit." This never happened at 4023 California.

70.     Mr. Clark's son, Don, Jr., would visit him almost daily and stay for at least an hour to provide care for his father, including doing chores like taking out his father's trash.

71.     Mr. Clark had no other visitors beyond his other children, grandchildren, and a home healthcare provider, who would also visit for at least an hour at a time to see him.

72.     His children, grandchildren, and home healthcare provider never saw narcotics in his home, nor did they see people come into his home for short periods of time.

73.     Defendant Strode used boilerplate phrases and allegations referenced in other warrant applications, including identical references to confidential informants claiming to have observed the suspected individual and/or residence as in possession of firearms and/or narcotics within the prior 24 hours before Defendant Strode submitted the affidavit to the 22nd Judicial Circuit Court of Missouri.

74.     In each of at least 27 warrants Defendant Strode is known to have requested in the year prior to the killing of Mr. Clark, Defendant Strode requested a "no knock" search warrant.[1]

75.     With a wholly false and boilerplate affidavit, Defendant Strode successfully secured a "no knock" warrant to search Mr. Clark's home that was signed by Judge Barbara Peebles on February 20, 2017.

76.     On February 21, 2017, Defendant Jones held an internal briefing with the SWAT team, using the information Defendant Strode provided in an operations plan.

77.     Defendant Strode would later brief the entire team, telling them that the warrants they would execute were "no knock" warrants.

78.     After SLMPD killed Mr. Clark, Defendant Strode first searched 4029 California and then 4025 California.

79.     After searching those homes, Defendant Strode was seen carrying a box from 4029 or 4025 California into 4023 California.

80.     Defendant Strode later reported in his return for the search warrant that there were illicit drugs found in Mr. Clark's home.

81.     According to those who were caretakers and regular visitors to Mr. Clark's home, including Don, Jr. and Mr. Clark's home health aide, there were never any illegal drugs at 4023 California.

**CLAIMS FOR RELIEF**

**Count I – 42 U.S.C. § 1983**
**Fourth Amendment – Unlawful Search and Seizure**
(Against Defendant Strode)

---

[1] Plaintiffs' counsel reviewed all warrants available on the "Case net" online database from the 22nd Judicial Circuit of Missouri for the year prior to the killing of Mr. Clark and identified 27 warrants and affidavits attributed to Defendant Strode.

82.     Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

83.     Defendant Strode's warrant was "based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth' — including . . . material omissions of fact — [which] violates the Fourth Amendment." *Z.J. by & through Jones v. Kansas City Bd. of Police Comm'rs*, 931 F.3d 672, 686 (8th Cir. 2019) (citation and quotation marks omitted).

84.     Defendant Strode included allegations – attributed to supposed confidential informants – in the warrant affidavit that he knew to be false: that Mr. Clark was harboring and selling illegal drugs and harboring illegal guns.

85.     Defendant Strode lied that he had observed foot and vehicle traffic consistent with drug trafficking at Mr. Clark's home, including seeing people entering 4023 California for brief periods of time and  then exiting.

86.     Even if Defendant Strode had arguable probable cause for the search warrant — which he did not — he lacked "reasonable suspicion that knocking and announcing [the officers'] presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime." *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

87.     Mr. Clark's age, work history, and disabilities undermine Defendant Strode's assertion that he had reasonable suspicion to dispense with the knock and announce requirement.

88.     Given Mr. Clark's background and the false allegations by Defendant Strode, it would not have been dangerous or futile to knock and announce.

89.     As a direct and proximate result of Defendant Strode's conduct, Mr. Clark was deprived of his right to be free from unlawful seizure under the Fourth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983.

90.     Defendant Strode's application for the "no knock" warrant, under false pretenses, set into motion the events that led to Mr. Clark's death.

91.     Defendant Officers appeared at Mr. Clark's home under the false impression that Mr. Clark was dangerous.

92.     Defendant Officers broke down Mr. Clark 's door without allowing sufficient time for him – an elderly and disabled man – to get to the door, as would have been available with the execution of a normal warrant.

93.     Upon entry, Defendant Ronald Mueller threw a diversionary device into Mr. Clark's home, which further disoriented him given his limited eyesight.

94.      Defendant Manasco shot Mr. Clark without providing any announcement or warning.

95.     None of the foregoing would have occurred without the conduct of Defendant Strode.

96.     Because Mr. Clark lost his life, Plaintiffs have been deprived of their father's companionship, services, instruction, guidance, counsel, lost wages, and support.

97.     The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Clark, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

98.     Plaintiffs also seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count II – 42 U.S.C. § 1983**
**Fourteenth Amendment – Reckless Investigation**
(Against Defendant Strode)

13

99.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

100.    Defendant Strode is liable for a "constitutionally deficient investigation" because he purposefully ignored evidence suggesting Mr. Clark's innocence. *Engesser v. Fox*, 993 F.3d 626, 629 (8th Cir. 2021) (citation omitted).

101.    Defendant Strode lied about allegations that Mr. Clark had engaged in criminal activity.

102.    Mr. Clark received in-home healthcare at least once a week and was visited by his son who provided physical care for him on an almost daily basis. Neither saw any illegal drugs or illegal firearms in his home.

103.    A modicum of investigation into Mr. Clark, such as actually observing him near or around his home, looking up his employment history, or attempting a controlled drug purchase, would have shown Defendant Strode that Mr. Clark was innocent, and that a "no knock" warrant was not warranted.

104.    Mr. Clark was elderly, had multiple disabilities, and a history in the military and working private security, and thus a commitment to public safety, that would all demonstrate that there was no reason to believe he was storing or selling illegal drugs or illegal weapons.

105.    Defendant Strode's actions were reckless and purposeful.

106.    Defendant Strode's affidavit in pursuit of said warrant includes details from supposed confidential informants, but admits that Defendant Strode failed to corroborate or confirm the claims of these alleged confidential informants.

14

107.    As a direct and proximate result of the conduct of Defendant Strode, Mr. Clark was deprived of his right to be free from reckless investigation under the Fourteenth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983.

108.    Because Mr. Clark lost his life, Plaintiffs have been deprived of their father's companionship, services, instruction, guidance, counsel, lost wages, and support.

109.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Clark, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

110.    Plaintiffs also seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### Count III – 42 U.S.C. § 1983
### Fourth Amendment – Unlawful Authorization of SWAT Team
(Against Defendant Strode)

111.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

112.    Defendant Strode's "decision to authorize a SWAT team to execute [the] warrant" was unreasonable and thus constitutes a Fourth Amendment violation. *Z.J. by & through Jones*, 931 F.3d at 688 (citing *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189–92 (10th Cir. 2001)).

113.    Defendant Strode planned "a surprise, 'no-knock' raid by a SWAT team and [knew] a significant amount of force [would] be used." *Id.*

114.    Defendant Strode specifically knew that he had no information and had done no investigation "that would have supported the need to send the SWAT team to execute the search warrant," but he sent them anyway. *Id.*

115.    Defendant Strode requested and received "no knock" warrants in 100% of the 27 search warrant applications Plaintiffs' counsel identified in the year prior to Mr. Clark's killing, highlighting his indiscriminate authorization of SWAT without a reasonable basis.

116.    As a direct and proximate result of the conduct of Defendant Strode, Mr. Clark was deprived of his right to be free from the unlawful authorization of SWAT to execute a search warrant, under the Fourth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983.

117.    Because Mr. Clark lost his life, Plaintiffs have been deprived of their father's companionship, services, instruction, guidance, counsel, lost wages, and support.

118.    The acts described herein were intentional, wanton, malicious, and callously indifferent to the rights of Mr. Clark, such that punitive damages should be awarded to punish Defendant Strode and to deter him, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

119.    Plaintiffs also seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### Count IV – 42 U.S.C. § 1983
### Fourth and Fourteenth Amendment – Excessive Force
(Against Defendant Manasco)

120.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

121.    By shooting Mr. Clark, Defendant Manasco effectuated a seizure under the Fourth Amendment. *Est. of Morgan v. Cook*, 686 F.3d 494, 496 (8th Cir. 2012) (citation omitted).

122.    Defendant Manasco failed to announce himself as law enforcement and provided no warning to Mr. Clark before entering 4023 California with his gun at the ready.

123.    Within moments of entering the house, Defendant Manasco saw Mr. Clark and shot him no less than nine times, nearly detaching his arm.

124.    Defendant Manasco did not warn Mr. Clark before unleashing a barrage of gunfire to his torso, despite ample opportunity to warn.

125.    Upon information and belief, Mr. Clark was unarmed and not a threat at the time Defendant Manasco shot him.

126.    The conduct of Defendant Manasco was unreasonable, unlawful, and unconstitutional, in that Defendant Manasco used more force than was reasonably necessary under the circumstances.

127.    A reasonable officer in Defendant Manasco's position would have understood that he was required to adequately announce his presence and authority under the circumstances.

128.    A reasonable officer in Defendant Manasco's position would have understood that he was required to provide adequate warning, such that Mr. Clark had the opportunity to comply with any commands.

129.    A reasonable officer in Defendant Manasco's position would have known that firing over nine rounds from an automatic rifle was an unreasonable use of force under the circumstances.

130.    As a direct result of Defendant Manasco's unlawful shooting and excessive use of force, Mr. Clark was deprived of his right to be secure in his person, his right to be free from the

unreasonable seizure of his person, and his right to be secure from the use of excessive force in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States of America and 42 U.S.C. § 1983.

131.    As a direct result of Defendant Manasco's unlawful shooting and excessive use of force against Mr. Clark, Plaintiffs have been deprived of their father's society, comfort, companionship, services, instruction, guidance, counsel, and support.

132.    The acts of Defendant Manasco, as set forth above, were intentional, wanton, malicious, evil, and oppressive, or exhibited a reckless indifference or conscious disregard for Mr. Clark's federally-protected rights, thus entitling Plaintiffs to an award of punitive damages against Defendant Manasco in order to punish him and to deter him and others similarly situated from like conduct in the future.

133.    Plaintiffs also seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count V – 42 U.S.C. § 1983**
**Fourteenth Amendment – Deliberate Indifference**
(Against Defendants Jones, Manasco, James Wurm, Brandon Moore, Ronald Mueller, Joshua Becherer, Ronald Allen, Bennie Blackmon, Daniel Book, Matthew Tesreau, James Zwilling, Mark Seper, Glennon Frigerio, Joseph Busso, Jon Long, Daniel Cora, Timothy Boyce, Michael Flatley, Curtis Burgdorf)

134.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

135.    The Due Process Clause of the Fourteenth Amendment required Defendants to provide medical care to Mr. Clark if he was injured while being apprehended by the police. *Teasley v. Forler*, 548 F. Supp. 2d 694, 709 (E.D. Mo. 2008) (citation omitted).

136.    After mercilessly and unlawfully shooting Mr. Clark repeatedly, Defendant Manasco failed to call for medical care for Mr. Clark.

137.    No Defendant Officers took action to stanch Mr. Clark's bleeding or provide any form of emergency first aid in the first crucial minutes after Defendant Mansco shot him..

138.    Instead, Defendant Officers stood over Mr. Clark, pointing their guns at him or otherwise passing by, while he mumbled incoherently and bled to death on his bedroom floor.

139.    Defendant Officers did not immediately seek emergency medical care for Mr. Clark.

140.    It was not until Defendant Aubuchon heard the shootings from 4025 California, walked over, and saw Mr. Clark bleeding out on the floor that someone finally called EMS to provide medical care.

141.    Mr. Clark was suffering an obvious, serious medical need after being shot no less than nine times with an assault rifle.

142.    The period of time between Defendant Manasco shooting Mr. Clark and Defendant Aubuchon calling EMS consisted of the crucial minutes when Defendant Officers could have provided (or caused to be provided) medical support to Mr. Clark to stanch his bleeding and save his life.

143.    Mr. Clark's death occurred as a direct and proximate result of Defendants' deliberately indifferent actions.

144.    Mr. Clark's death, following Defendant Officers' delay in summoning medical care, was a reasonable and probable consequence of Defendants' acts and omissions.

145.    As a further direct and proximate result of the conduct of Defendant Officers, Mr. Clark was deprived of his right to be free from deliberate indifference to his medical needs under the Fourteenth Amendment of the Constitution of the United States of America and 42 U.S.C. § 1983.

146.    The acts of Defendant Officers, as set forth above, were intentional, wanton, malicious, evil and oppressive, or exhibited a reckless indifference or conscious disregard for Mr. Clark's federally-protected rights, thus entitling Plaintiffs to an award of punitive damages against Defendant Officers in order to punish Defendants and to deter them and others similarly situated from like conduct in the future.

147.    Plaintiffs also seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### Count VI – 42 U.S.C. § 1983
### Municipal Liability under *Monell*
(Against Defendant City of St. Louis)

148.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

149.    Defendant City has policies and/or customs of (1) seeking warrants without probable cause, including falsifying information about potential suspects, allegations from confidential informants, and observations of suspicious activity; (2) unreasonably requesting and deploying SWAT for all search warrants; and (3) failing to ensure police officers are supervised and disciplined for violations of arrestees' constitutional rights.

150.    Mr. Clark's death is a result of the aforementioned policies or customs.

151.    Defendant City is therefore culpable for the constitutional violations set forth in the aforementioned Counts, pursuant to *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

152.    The policy or custom of seeking warrants without probable cause, including falsifying information, led to Mr. Clark's death.

153.    In a 2020 report, the Ethical Society of Police, an organization of primarily African-American police officers in St. Louis, documented numerous incidents wherein SLMPD officers

falsified information and otherwise engaged in unlawful conduct to seek search warrants, including:

     a.  A 2015 incident in which a Caucasian male officer lied in a search warrant application and stated he completed surveillance on a subject;

     b.  A separate incident when an African-American officer committed a similar offense;

     c.  A 2016 incident when a Caucasian male officer repeatedly placed the same wording in search warrants.

154.    Numerous other incidents of similar behavior have been identified by other parties.

155.    A St. Louis Post-Dispatch review of warrant application affidavits provided by SLMPD Officer Shell Sharp from 2007-08 showed that all but one affidavit outlined the same pattern of surveillance, suspicious activity observed, and information from a confidential informant.[2]

156.    Just like Defendant Strode, Officer Sharp lied about "conducting surveillance" as well as about observing "suspicious activity."[3]

157.    A separate officer, William "Bill" Noonan, was identified as having also sought warrants without probable cause. Officer Noonan later told reporters that "he was told that if he retired, internal affairs investigators would not continue to pursue [other officers]" even though another officer had come under suspicion of similar conduct.[4]

---

[2] Robert Patrick, *Former St. Louis officers allege 'witch hunt'*, St. Louis Post-Dispatch (Jan. 2, 2010), https://www.stltoday.com/news/former-st-louis-officers-allege-witch-hunt/article_18909dcd-e6d0-5641-9ced-5ef56b562895 html.

[3] *Id.*

[4] *Id.*

158.    Then-Circuit Attorney Jennifer Joyce told the newspaper "that she had also lost confidence in Officer Mike Mathews, because of his refusal to submit to questions about one of his search warrants."[5]

159.    On September 14, 2016, the Honorable Elizabeth Hogan, Circuit Judge for the 22nd Judicial Circuit of the State of Missouri, found that SLMPD Officer Ellis Brown gave conflicting statements in a sworn affidavit and in testimony regarding whether a confidential informant provided information for a warrant application. It was upon this false information that Officer Brown secured a search warrant to unlawfully search a St. Louis resident's home. In that case, the state court judge demanded Officer Brown be provided an attorney because his testimony "implicate[d] practices and procedures within the entire St. Louis Police Department." *State of Missouri v. Aaron White*, No. 1522-CR03779-01 (22nd Judicial Circuit Sept. 4, 2016).

160.    Then-SLMPD Commissioner Doyle Sam Dotson III was aware, or should have been aware, of the numerous instances of officers falsifying information to secure search warrants and otherwise applying for search warrants without probable cause.

161.    Despite that knowledge, Commissioner Dotson took no action in response to the conduct of these officers or to prevent future similar conduct from those officers.

162.    Commissioner Dotson failed to do so despite being aware that officers serving unlawful search warrants, particularly when the warrants are executed by SWAT officers, can yield deadly consequences.

163.    This SLMPD policy and custom of seeking warrants without probable cause was a moving force behind the constitutional violation of Mr. Clark's rights.

---

[5] *Id*

164.     Commissioner Dotson further set a policy that required SLMPD officers to use SWAT when they executed virtually every drug-related search warrant, all without first requiring such officers demonstrate the reasonable suspicion or probable cause otherwise necessary to justify the excessive force inherent in the use of SWAT.

165.     In *State of Missouri v. Aaron White*, No. 1522-CR03779-01, Officer Brown testified that SLMPD's policy requires virtually all of their work to utilize SWAT for "safety reasons." If SWAT is not available, SLMPD officers and detectives "have to wait until [they] have those people in place before [they] can execute the warrant."

166.     According to information obtained by the Coalition Against Police Crimes and Repression ("CAPCR") through public records requests, SWAT was deployed ***over 1780 times*** from 2012 to 2018. Around 97% of all SWAT deployments during this time period were to execute search warrants.

167.     CAPCR's research found that of the 10 fatal police shootings by SLMPD officers between 2013 to 2018 that have publicly identified officers, eight involved SWAT members or officers who would later join SWAT, highlighting the inherent danger in the deployment of SLMPD SWAT officers.

168.     Commissioner Dotson set the foregoing policy regarding deployment of SWAT to execute all drug-related search warrants despite knowing the danger of doing so.

169.     Specifically, Commissioner Dotson knew the practice of SWAT was to execute search warrants for contraband through the use of extreme physical force, such as the use of assault rifles, diversionary devices, and other military tactics.

170.     Defendant City of St. Louis was deliberately indifferent to the danger inherent in adopting and implementing such a policy.

171.    Commissioner Dotson's decision to deploy SWAT for all search warrants, without first requiring officers to demonstrate the reasonableness of authorizing SWAT, was a direct cause in the violation of Mr. Clark's constitutional rights and loss of life.

172.    Defendant City of St. Louis is also liable for its failure to supervise and discipline SLMPD officers for seeking warrants without probable cause, including by falsifying information and failing to corroborate confidential informant's allegations prior to seeking warrants; deploying SWAT for all search warrants (without reasonable suspicion or probable cause to support the excessive force inherent in the use of SWAT); and otherwise violating individuals' constitutional rights.

173.    A failure to supervise claim exists where: "(1) [the City's practices] were inadequate; (2) [the Cit]y was deliberately indifferent to the rights of others in adopting them, such that the failure to train or supervise reflects a deliberate or conscious choice by the [City]; and (3) an alleged deficiency in the training [or supervising] procedures actually caused the plaintiff's injury." *B.A.B., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012) (cleaned up) (quoting *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010)).

174.    SLMPD officers face little to no discipline or job consequences for seeking warrants without probable cause; seeking "no knock" warrants without reasonable suspicion to dispense with the knock and announce requirement; or unlawfully authorizing SWAT for all search warrants, without the requisite showing that such force is required to execute the warrant.

175.    Countless newspaper articles detail SLMPD's Internal Affairs and the Force Investigative Unit's failure to properly investigate police killings in the years preceding (and following) Mr. Clark's killing.[6]

176.    The aforementioned Ethical Society of Police research highlights numerous instances in which Caucasian SLMPD officers—who, based on recent figures, constitute over 66 percent of SLMPD—have not been properly disciplined for similar behavior alleged in this Complaint:

a.    In 2015, a Caucasian male officer lied in a search warrant. The officer represented that he completed surveillance on a subject, but he was assigned to a detail at the time he allegedly completed such surveillance. As a result of the officer's lack of prior surveillance, he forced entry into the wrong house. SLMPD's original recommendation was to fire the officer, but the former interim Chief (and former Chief, Sam Dotson) refused to terminate him.

b.    In 2016, a Caucasian male officer used identical wording in multiple affidavits supporting search warrant applications. The cases in which these warrants were sought were dismissed for this reason. The officer did not face any significant discipline, and he was not charged criminally. This officer was allowed to resign rather than face any consequences.

---

[6] *See, e.g.,* Alison Flowers & Sam Stecklow, *A Police Killing in St. Louis Remains Shrouded in Darkness,* Riverfront Times (May 29, 2021), https://www.riverfronttimes.com/newsblog/2021/05/29/a-police-killing-in-st-louis-remains-shrouded-in-darkness; Champe Barton, *St. Louis Has Never Shared Police Shooting Investigation Results With Its Civilian Oversight Board*, The Trace (Apr. 3, 2021),https://www.thetrace.org/2021/04/st-louis-police-shootings-civilian-oversight-board/.

c.   In August 2016, a complaint was levied against a Caucasian male officer for uncivil treatment. The officer allegedly told the complainant that he "would be the next person killed by police."

177.   Defendant Manasco, after taking part in the killing of Carlos Boles in March 2011, took pictures of Boles's bullet-ridden body and shared it with another officer. Despite talks of an "investigation," Defendant Manasco remained in SWAT and, since then, has been party not only to the killing of Don Clark, but also Isaiah Hammett, the latter of which occurred mere months after taking Don Clark's life.[7]

178.   Even when the serving of a warrant by SWAT officers results in a civilian injury or fatality, the investigation by SLMPD is perfunctory and aimed at protecting officers rather than determining if there has been a violation of civilian's rights.  For example, officers are typically not promptly interviewed, and, when they are interviewed, officers are asked leading questions. Alternatively, witnesses or complainants are subjected to hostile cross-examination.

179.   The foregoing demonstrates deliberate indifference on the part of the City of St. Louis. The need to supervise SWAT officers to prevent them from violating potential arrestees' rights, and to discipline them if and when they do, is so obvious that the City's failure to do so was (and is) likely to result in the rights of people such as Mr. Clark being violated.

180.   This failure to sufficiently supervise and/or discipline led directly to Mr. Clark's death.

---

[7] *St. Louis police probing leaked Carlos Boles crime scene photo*, St. Louis Post-Dispatch (Mar. 15, 2011), https://www.stltoday.com/news/local/metro/st-louis-police-probing-leaked-carlos-boles-crime-scene-photo/article_7e7b4938-4f35-11e0-a628-00127992bc8b.html

181.     Because of Defendant City of St. Louis' policies and customs as described herein, Defendant Strode knew that there would be no substantive investigation into his failure to secure probable cause before applying for the warrant that led to Mr. Clark's death.

182.     Further, Defendant Strode could be certain that there would be no discipline or supervision related to his applying for a "no knock" warrant without reasonable suspicion to dispense with the knock and announce requirement.

183.     Because of the policies and customs of Defendant City of St. Louis, Defendant Manasco was well aware that he could use excessive force to take Mr. Clark's life without threat of repercussion from his employer.

184.     Had Defendant City of St. Louis properly trained, supervised, and disciplined officers for countless past violations, the officers would not have allowed this merciless raid to happen in the first instance.

185.     These failures and City policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Mr. Clark as alleged herein.

186.     As a result of Defendant City of St. Louis' unconstitutional policies or customs and failure to discipline or supervise police officers, Plaintiffs' father was deprived of his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, which is remediable under 42 U.S.C. § 1983.

187.     Plaintiffs seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count VII – 42 U.S.C. § 1983**
**Fourteenth Amendment – State Created Danger**
(Against Defendant City and Defendant Strode)

188.     Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

27

189.    Defendant City and Defendant Strode created a dangerous situation that violated Mr. Clark's fundamental, substantive due process rights to "personal safety." *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 873 (8th Cir. 2007).

190.    Defendant Strode's false allegations in his search warrant application, his "unwarranted direction of suspicion" toward Mr. Clark, and his indiscriminate requests for "no knock" warrants and authorization of SWAT created a situation that necessarily led to Mr. Clark's violent and wholly preventable death. *Id.* Defendant Strode's actions put "[Mr. Clark] in danger of an armed police raid [and] other assaultive conduct" by the Defendant Officers. *Id.* at 874–75.

191.    Defendant City's policies and customs, as described herein, created a danger that Mr. Clark would be seriously injured or killed that would not have existed but for the Defendant City's actions.

192.    Defendant City and Defendant Strode's deliberate indifference to Mr. Clark's substantive due process rights shocks the conscience. Mr. Clark, an elderly and disabled veteran, died a violent and horrific death based on Defendant City and Defendant Strode's actions that created a "danger of significant harm to [him] that did not previously exist." *Id.* at 875 (citation and quotations omitted).

193.    As a result of Defendant City and Defendant Strode's conduct, Plaintiffs' father was deprived of his rights under the Fourteenth Amendment to the Constitution of the United States, which is remediable under 42 U.S.C. § 1983.

194.    The acts of Defendant Strode, as set forth above, were intentional, wanton, malicious, evil and oppressive, or exhibited a reckless indifference or conscious disregard for Mr. Clark's federally-protected rights, thus entitling Plaintiffs to an award of punitive damages against

28

Defendant Strode in order to punish him and to deter him and others similarly situated from like conduct in the future.

195.    Plaintiffs seek an award of attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count VIII**
**Wrongful Death Pursuant to 537.080, RSMo 2018**
(Against All Defendants**)**

196.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

197.    Under Missouri law, a plaintiff can establish a wrongful death claim on a theory of negligence by showing: "(1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the breach was the cause in fact and the proximate cause of his death; and (4) as a result of the breach, the plaintiff suffered damages." *Heffernan v. Reinhold*, 73 S.W.3d 659, 665 (Mo. Ct. App. E.D. 2002) (citation omitted).

198.    Defendant City of St. Louis, as well as its officers, owed a duty to Mr. Clark to ensure his safety and security, which includes providing adequate medical care when needed.

199.    As discussed more fully in Counts I-VII, *supra*, and incorporated herein, Defendants breached their duty of care by failing to properly investigate before seeking a warrant, falsifying information in the supporting affidavit for the warrant, seeking a warrant without probable cause, seeking a "no knock" warrant without reasonable suspicion to dispense with the knock and announce requirement, unreasonably authorizing the use of SWAT, using excessive force to execute the warrant, and failing to provide medical care to Mr. Clark in his time of need.

200.    Defendant City of St. Louis breached its duty by implementing policies or customs that resulted in Defendant Officers' unlawful conduct, which in turn resulted in the loss of Mr. Clark 's life.

201.   Further, Mr. Clark's death was a direct and proximate result of Defendants' grossly negligent acts because, but for the actions of Defendants, Mr. Clark would not have died, and his death was a reasonable and probable consequence of Defendants' acts and omissions.

202.   It was reasonably foreseeable that Defendants' conduct, namely seeking a "no knock" warrant and authorizing SWAT to execute it without probable cause or proper investigation, would result in a preventable death, given the inherently dangerous nature of SWAT-executed warrants.

203.   Additionally, but for Defendant City of St. Louis's policies and/or customs as described herein, Mr. Clark would be alive. Further, it was reasonably foreseeable that the City's policies and/or customs as described herein would have resulted in a preventable death. Thus, Defendant City of St. Louis's actions were both the direct and proximate cause of Mr. Clark's death.

204.   Defendant Officers' actions and omissions as described above were undertaken in bad faith and with malice, and constituted a conscious abuse of their powers and duties as correctional officers, such that punitive damages should be awarded to punish Defendant Officers and to deter them, as well as other similarly situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

205.   Furthermore, Defendant City of St. Louis has waived sovereign immunity by having an insurance policy and/or adopting a plan of self-insurance, which is liable to satisfy all or part of a possible judgment in the action, or to indemnify or reimburse for payments made to satisfy a judgment in this action.

206.   Namely, Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not-for-profit corporation which is funded, at least in part, by annual

payments from the City. On information and belief, the funds are later disbursed by the corporation to pay any and all claims against the City, including claims against City police officers relating to violations of constitutional rights.

207.    The coverage provided by the PFPC constitutes insurance or, in the alternative, a self-insurance plan, for purposes of section 537.610, RSMo.

208.    As a direct and proximate result of the actions of all Defendants described above, and pursuant to section 537.090, RSMo, Plaintiffs claim the following damages: pecuniary loss suffered by reason of the death of Mr. Clark; Mr. Clark's funeral expenses; and a reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which Plaintiffs have been deprived by reason of the death of Mr. Clark.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order in its favor and award compensation for all losses and damages including but not limited to:

    a.  Actual economic damages as established at trial;

    b.  Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

    c.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

    d.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

        1.  Issuance of a formal written apology from each Defendant to the Plaintiffs;

    2.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    3.  Mandatory training designed to avoid future similar misconduct by Defendants;

e.  Pre-judgment and post-judgment interest at the highest lawful rate;

f.  Attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law; and

g.  All appropriate relief at law and equity that justice requires.


Dated:  June 30, 2021                Respectfully submitted,

By:

ARCHCITY DEFENDERS, INC.

*/s/ Emanuel Powell*
Blake A. Strode (MBE #68422MO)
Jacki Langum (MBE #58881MO)
John M. Waldron (MBE #70401MO)
Maureen Hanlon (MBE #70990MO)
Matthew Dollan (MBE #71867MO)
Nathaniel R. Carroll (MBE #67988MO)
Emanuel Powell (MBE #73297MO)
440 N. 4th Street, Suite 390
Saint Louis, MO 63102
855-724-2489
314-925-1307 (fax)
bstrode@archcitydefenders.org
jlangum@archcitydefenders.org
jwaldron@archcitydefenders.org
mhanlon@archcitydefenders.org
mdollan@archcitydefenders.org
ncarroll@archcitydefenders.org
epowell@archcitydefenders.org

JERRYL T. CHRISTMAS & ASSOCIATES LLC

*/s/ Jerryl T. Christmas*

Jerryl T. Christmas  (MBE #45370MO)
6101 Delmar Boulevard
Saint Louis, MO 63112
314-588-7105
314-361-2525 (fax)
christmaslaw@yahoo.com

*Attorneys for the Plaintiffs*