**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| DON R. CLARK, JR., et al. | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ST. LOUIS, MISSOURI, et al. | ) | No. 4:21-cv-00788-JMD |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |

## Order Granting Motion for Summary Judgment

This case arises from an officer shooting the target of a search warrant. Detective Thomas Strode obtained a warrant to search Don Clark's residence for illegal guns and drugs. As officers entered without knocking, Clark shot at the officers but missed. Officer Nicholas Manasco shot and killed Clark. Clark's family sued Strode, Manasco, and the City of St. Louis, alleging violations of the Fourth Amendment, the Fourteenth Amendment, and state law. The officers and the City moved for summary judgment. None of the evidence Clark's family submitted is sufficient to establish that Strode's warrant lacked probable cause (and that he knew or should have known that), nor that a reasonable officer in Manasco's position would have been required not to use deadly force. The Court grants the motion for summary judgment.

## Factual Background

On February 21, 2017, Strode requested a search warrant for Don Clark's residence at 4023 California Avenue as well as for two other residences on the same 4000 block. In his affidavit for the warrant, Strode explained that several confidential sources or informants had flagged the block as a drug-trafficking hub, identifying six contiguous addresses involved in drug trafficking: Clark's address, three adjacent buildings, and two addresses directly

1

across the street. ECF 127-1 at 9–10. Strode provided one of the confidential sources, CS3, with photographs from governmental databases. From those photographs, CS3 identified Clark and others as individuals involved in distributing narcotics on the 4000 block. *Id.* at 10. Strode wrote in his affidavit that CS3 also told him Clark "was distributing quantities of marijuana from his residence at 4023 California" and that Clark "allowed other individuals from the area to store illicit narcotics and weapons at the residence." *Id.* at 13. Later, a confidential informant, CI2, informed Strode that he observed the distribution of controlled substances at 4023 California and other addresses. The affidavit also stated that CI2 was "familiar with" Clark and other subjects on the 4000 block. *Id.*

Strode reported in the affidavit that he surveilled the block many times over several weeks to corroborate the information. He noted that it was "difficult to conduct surveillance on the residence from very close distances and for extended periods of time" because confidential informants and sources told him that "individuals on the block would regularly conduct counter surveillance in an effort to identify any law enforcement agents in the area." *Id.* at 17. Nonetheless, Strode reported that, during the week of January 23, 2017, he "observed foot and vehicle traffic consistent with narcotic trafficking activity" at 4023 California, among other residences. *Id.* at 18. "Individuals would approach the residences . . . and enter inside for a brief period of time (5-10 minutes) then exit." *Id.* Finally, Strode wrote that, on February 20, 2017, CI2 advised him that "there were firearms and narcotics being stored inside of 4023 California, 4025 California, and 4029 California within the past 24 hours." *Id.* A judge of the Circuit Court of the City of St. Louis approved the warrant that day, February 21.

That evening, officers executed the search warrant. After breaching and searching the other two residences in the affidavit, officers breached 4023 California. Officers Brandon Moore, Nicholas Manasco, Ronald A. Mueller, and Joshua Becherer executed the warrant

against 4023 California. Moore breached the door with a ram, as the officers shouted "Police." (The parties dispute whether the announcement occurred before or during breach of the door.) Mueller deployed a flash-bang device. Multiple officers testify that they heard—or, in Manasco's case, felt—a gunshot go by. Clark's bed was in the front room of the residence, parallel to the front door frame and against the right wall. Manasco says he entered the room and saw Clark standing in the right corner of the room, pointing a gun at him. Manasco fired seven or eight shots at Clark, killing him. Becherer then retrieved the handgun that he says Clark was holding.

Two days later, Detective Strode filed an inventory statement with the state court, reporting that officers seized several items from 4023 California, including a Glock handgun, a 9mm Tarus handgun, a plastic bag containing 8.39 grams of heroin, two plastic bags containing .005 grams of Hydrocodone, three plastic bags containing .5 grams of suspected marijuana, one plastic bag containing numerous empty clear and red capsules, and multiple boxes of ammunition. ECF 127-1 at 1. Photographs taken after the shooting depict Clark's body by the bed, a bullet casing, a bullet hole in the front door, and a bullet on the ground on the other side of the door. ECF 137-49.

## Standard of Review

Clark's family sued Strode, Manasco, the City of St. Louis, and others. The Court previously dismissed several counts in whole or in part, and dismissed all defendants except Strode, Manasco, and the City. The following counts remain: claims against Strode under 42 U.S.C. § 1983 for unreasonable search and seizure in violation of Clark's Fourth Amendment rights and for insufficient investigation in violation of Clark's Fourteenth Amendment rights; a claim against Manasco under § 1983 for unreasonable use of force in violation of Clark's Fourth Amendment rights; a claim under Missouri law against Strode for wrongful death; and *Monell* claims against the City of St. Louis for unconstitutional policies, unconstitutional

customs, and failure to train officers.  Defendants moved for summary judgment on all counts, asserting qualified immunity against the § 1983 claims.

The Court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movants bear the initial burden to "identify those portions of the record which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up).  In response, the nonmovants must "set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue." *Hodge By and through Farrow v. Walgreen Co.*, 37 F.4th 461, 465 (8th Cir. 2022) (citation omitted).  The nonmovants "may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Nationwide Prop. and Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016).  For all genuinely disputed facts, the Court views the facts in "the light most favorable to the nonmoving party." *Torgerson*, 643 F.3d at 1042 (citation omitted).

Strode and Manasco assert qualified immunity.  Qualified immunity applies if officers did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). In qualified immunity cases, the duty of the Court is essentially to "identif[y] the disputed facts, construe[] them in the light most favorable to [the nonmovants], and then consider[], on those facts, whether [the nonmovants] ha[ve] shown a violation of a constitutional right that was clearly established at the time of the incident." *Kelly v. Pruett*, 163 F.4th 1130, 1134 (8th Cir. 2026).

### Count I: Unreasonable Search

On Count I, Clark's family asserts that Strode engaged in an unlawful search by deliberately lying to the judge to obtain a warrant or by submitting an affidavit with reckless

4

disregard for the truth. This argument invokes the clearly established law that "the Fourth Amendment requires a truthful factual showing sufficient to constitute probable cause in a sworn affidavit." *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1313 (8th Cir. 2014) (citation omitted). A plaintiff can establish a violation of the Fourth Amendment by proving (1) "that a false statement knowingly and intentionally, or with reckless disregard to the truth, was included in the affidavit," and (2) "that the affidavit's remaining content is insufficient to provide probable cause." *Id.* at 1311 (citation omitted) (discussing *Franks v. Delaware*, 438 U.S. 154 (1978)). The party challenging the warrant affidavit bears "the burden of proving the intentional or reckless inclusion of false statements in a warrant affidavit." *United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995). Clark's family cannot meet that burden.

Clark's family faces an uphill battle because of the "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171. "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that" Strode "acted in an objectively reasonable manner" under the Fourth Amendment. *Williams*, 772 F.3d at 1311 (cleaned up).

To overcome that presumption, the family must identify sufficient evidence in the record that would allow a reasonable jury to conclude that Strode knew, or should have known, that he included falsehoods in his warrant affidavit without which the warrant lacked probable cause. *See Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018) (explaining that "if the nonmoving party must prove $X$ to prevail, the moving party at summary judgment can . . . point out that the nonmoving party lacks the evidence to prove $X$"). None of the facts cited by Clark's family would allow a reasonable jury to infer that Strode intentionally or recklessly included false information in his warrant affidavit.

Clark's family relies on several declarations by people who knew Clark, including his son, ECF 137-33, in-home nurse, ECF 155-64, landlord, ECF 155-46, and a neighbor, ECF 155-41. Each person declares that he or she never observed illegal drugs or drug distribution at Clark's residence. Clark's family also cites evidence in the record suggesting Clark had physical infirmities. Clark was 63 years old, and the declarations as well as health care records submitted by Clark's family suggest—viewed in the light most favorable to the nonmovants—that he suffered from poor vision, poor hearing, diabetes, limited mobility, and chronic pain because of arthritis. Finally, Clark's family notes that Clark had no criminal convictions—although he had a significant history of arrests.

But none of these facts warrant the giant leap a jury would have to take to conclude that Strode must have either deliberately fabricated information in his warrant affidavit or else recklessly included false information. Clark's family essentially would be asking a jury to make the following inferences: 1) because several people say they never noticed drug dealing at Clark's residence (and do not believe him to have been a drug dealer) and because Clark had never been convicted of anything, drug dealing must not have occurred; 2) CI2 and CS3 thus either did not exist or could not have told Strode that Clark possessed and distributed illegal drugs at 4023 California, or, at least, they told Strode information that he *must* have known was false; and 3) Strode intentionally or recklessly included false statements in his warrant affidavit.[1] These are not inferences a reasonable jury can make based solely on the facts in this record.

To sign the warrant affidavit, Strode needed to conclude only that there was probable cause—not certainty—that Clark's residence was used for illegal drug distribution.

---

[1] Clark's family cites nothing in the record to suggest that that Strode knew of Clark's physical infirmities. *See, e.g.*, ECF 137-32 at 74–75.

"Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (cleaned up). Probable cause is an objective test that depends on the facts known to the officer at the time. *Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004).[2] Clark's family assumes that if people close to Clark did not see Clark's residence used for illegal drug dealing, then no drug dealing occurred. But even assuming Clark was innocent, the inference does not follow that Strode lacked a basis to conclude there was a "fair probability" that Clark's residence was used for drug distribution. *Shockley*, 816 F.3d at 1061. Strode's informants, CI2 and CS3, were not anonymous sources. As Strode wrote in his affidavit, both CI2 and CS3 had "been used in the past and [had] proven to be reliable." ECF 127-1 at 13, 16. As Clark's family points out, confidential informants, though not confidential sources, pass a background check. Known to Strode, CI2 and CS3's reputations could be "assessed" by him and they both could "be held responsible if [their] allegations turn out to be fabricated." *See Florida v. J.L.*, 529 U.S. 266, 270 (2000).[3] More, Strode corroborated CI2 and CS3's statements by surveilling the 4000 block and witnessing short visits to 4023 California consistent with drug distribution. The Supreme Court recognizes "the value of corroboration of details of an informant's tip by independent police work." *Illinois v. Gates*, 462 U.S. 213, 241 (1983); *see also Turpin v. County of Rock*, 262 F.3d 779, 784 (8th Cir. 2001) ("Where the facts stated by

---

[2] Furthermore, "[f]or purposes of qualified immunity, the issue is not whether the [warrant] affidavit actually establishes probable cause, but rather whether the officer had an objectively reasonable belief that it established probable cause," based on the clearly established law at the time. *Mueller v. Tinkham*, 162 F.3d 999, 1003 (8th Cir. 1998) (citation omitted).

[3] Clark's family objects to the statements of the informants as hearsay, but "probable-cause determinations generally may be based on hearsay." *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005).

an informant are at least partially corroborated, the credibility and reliability of the informant are not crucial to the finding of probable cause."). Clark's family argues that the individuals approaching Clark's residence may have been his family, his landlord, or his nurse. But even assuming that the informants and sources were mistaken, that Strode's observations were faulty, and that Clark was in fact innocent, it does not mean that Strode lacked probable cause and thus must have fabricated evidence. An investigator can be factually wrong and still have probable cause. *See, e.g.*, *United States v. Simpkins*, 914 F.2d 1054, 1058 (8th Cir. 1990) ("The fact that an innocent purpose might explain [the suspected cocaine dealer's] conduct does not preclude the officers' good faith belief that evidence of drug trafficking would be found at the residence nor negate the officers' objectively reasonable belief that the warrant they obtained was valid.").

True, "the nonmoving party may draw upon favorable inferences from circumstance evidence to defeat summary judgment." *Do v. Wal-Mart Stores*, 162 F.3d 1010, 1013 (8th Cir. 1998). But Clark's family asks for much more. They ask not for a reasonable inference, but for rank speculation, and they do so against the backdrop presumption that the warrant was lawful and against the low bar for probable cause.

None of the cases cited by Clark's family support denying summary judgment. Clark's family cites several cases from the Eighth Circuit holding that an officer knew, or should have known, that his or her warrant affidavit included falsehoods and did not establish probable cause. In each case, the facts in the warrant affidavit were much more directly and clearly contradicted than they are here.

In *Williams*, a police chief in his affidavit for an arrest warrant cited a memo purportedly written by another police officer, but the other officer expressly denied writing the memo. 772 F.3d at 1311. More, the police chief and the person arrested "were at odds with each other." *Id.* The Eighth Circuit concluded that a "reasonable jury could find that

8

[the police chief] fabricated the officer's memo and intentionally included a false statement in the affidavit to make good on his promise to 'destroy' [the arrested individual]." *Id*. By contrast, Clark's family cites nothing to indicate that Strode had any negative relationship with Clark. Nor does either CI2 or CS3 deny that Strode's statements in the affidavit were accurate. Unlike *Williams*, there is no evidence that a jury could use to infer that the officer fabricated a report. Clark's family would ask the jury simply to speculate that Strode fabricated the affidavit. This Court does "not accept unreasonable inferences or sheer speculation as fact." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

In *Mueller*, the statement of an informant "was the sole basis for the search warrant application," and that informant expressly contradicted his statement. 162 F.3d at 1003. The officer asserted in his warrant that the informant had provided reliable information in the past, but the informant testified that the statement was false; he had never provided any information. *Id*. Also, the officers had reason to believe that the informant was not truthful, because the informant's mother told them that the informant was "a pathological liar," and the informant himself had "admitted lying to the officers." *Id*. Here, in contrast, CI2 and CS3 have provided no evidence to contradict Strode's affidavit, nor has any witness directly challenged their honesty. And CI2 and CS3's statements were not the only basis for the search warrant; Strode also conducted surveillance.

Finally, in *Burk v. Beene*, Burk was arrested for supposedly conducting a flight-controller seminar without a license. 948 F.2d 489, 491 (8th Cir. 1991). In the affidavit to justify the arrest warrant, the officer swore that Burk conducted the seminar and that certain unnamed "individuals" whom she contacted verified that the seminar occurred. *Id*. at 495. The problem was that the officer had good reason to know the seminar never occurred because she was there when it was cancelled, and people were still waiting to file into the

classroom, so she had good reason to know the seminar never started. The officer "was present when Burk cancelled the class and then left the seminar location after being advised that [the company] did not have the proper license." *Id.* And "when she arrived at the seminar location . . . , more than one-third of the seminar participants were waiting outside the classroom to pay." *Id.* A jury could have found in favor of the plaintiff in light of the "facts of the case as [the officer] would have known them at the time she made her sworn statement." *Id.* at 494. Here, by contrast, Clark's family points to no facts in the record that could establish that Strode would have known that Clark was innocent. And unlike in *Burk*, no facts in the record suggest that Strode knew, or should have known, that CI2 and CS3 provided false information and that the activity he observed was not illegal drug activity.

Clark's family also cites *United States v. Real Prop. Located at 324 Washington Ave. N., Minneapolis, Minn*, 480 F.3d 841 (8th Cir. 2007), but that case undermines their argument. *Real Property* involved an attempt by the Federal Government to seize a clubhouse under civil asset forfeiture because drug offenses allegedly occurred there. The Federal Government presented hard evidence of drugs found at the location and testimonial evidence of drug distributions occurring on specific occasions and, more generally, occurring "always" and "in the open." *Id.* at 845. In ruling that summary judgment for the Federal Government was not proper, the Eighth Circuit made several points that undermine the claims of Clark's family and distinguish that case from this one.

Most notably, the Eighth Circuit stressed the burden of proof. Summary judgment was improper because the *government* had the ultimate burden of proof at trial and the record included some information that would detract from the veracity of the government's testimony—meaning the government might be unable to satisfy its burden at trial. "The burden of proof is particularly relevant when the party with the burden of proof moves for

summary judgment and the opposing party presents evidence contesting the veracity of the movant's evidence." *Id*. at 845.  In that situation, a nonmoving party may avoid summary judgment by identifying "specific facts . . . that if proven would call the credibility of the moving party's witness into doubt." *Id*. (citation omitted).  But here, the burden is flipped. The warrant is presumptively valid.  It is Clark's family, not Strode, that has the burden of proof at trial.  Any contentions about Strode's veracity ring hollow when it is Clark's family that must furnish evidence in the first instance.

Second, unlike Clark's family, the witnesses in *Real Property* provided testimony that amounted to "direct contradictions."  *E.g.*, *id*. at 845–46 ("Matter testified that Seydel and Test were aware that Matter delivered methamphetamine to other members at the clubhouse.  Seydel and Test denied that accusation.").  Clark's family has done no such thing. They present declarations of individuals who say they never saw Clark use his residence to distribute or store drugs.  But the Eighth Circuit ruled this kind of testimony insufficient to avoid summary judgment.  Like the witnesses in *Real Property*, the declarants here "could not from their own personal knowledge refute all the testimony by the government's witnesses of substantial on-going drug activity."  *Id*. at 845.  In *Real Property*, what was significant about the defendant's witnesses was that their "direct contradictions" to the testimony of the government's witnesses—who had the ultimate burden of proof—"put the overall credibility of the government's witnesses *squarely at issue*."  *Id*. at 846, 845 (emphasis added).  And, separately, the government's witnesses were "neither disinterested nor inherently credible," for they were convicted of serious drug crimes and had "a strong incentive to win the government's support for reducing their sentences."  *Id*. at 846.  Here, the alleged observations of the declarants do not refute the possibility that drug activity occurred without their knowledge.  More essentially, they provide no "direct contradictions"

to Strode's testimony. *Id*. Nor does Clark's family point to any evidence to suggest Strode was biased against Clark. Particularly where it is Clark's family who would have the burden at trial, Clark's family "may not simply rest on the hope of discrediting the movant's evidence at trial." *Id*. at 844 (citation omitted).

Also relevant is *Moody v. St. Charles County*, where the plaintiff accused a police officer of falsely accusing him of selling drugs to cover up the officer's own illegal drug dealing. 23 F.3d 1410, 1411–12 (8th Cir. 1994). The plaintiff submitted depositions from individuals who testified that the officer was a habitual drug user and dealer. *Id*. at 1412. But the plaintiff failed to submit evidence that directly contradicted the officer. Most notably, he neglected to ask witnesses "'have you ever seen [plaintiff] sell drugs?' or 'on the night in question, did [plaintiff] sell cocaine to [the accusing officer] in your presence?'" *Id*. The Eighth Circuit affirmed the grant of summary judgment to the officer. Clark's family has likewise failed to directly contradict Strode's statements in his warrant affidavit.

In short, none of the evidence identified by Clark's family creates a genuine dispute of material fact. On the record in this case, to conclude that Strode intentionally or recklessly included false statements in his warrant affidavit, a jury would have to engage in "speculation, conjecture, or fantasy." *Id*. (citation omitted). Although several declarants testify that they never saw Clark possess or deal illegal drugs at 4023 California, no reasonable jury could infer that Strode therefore must have either fabricated evidence or recklessly included false statements in the warrant affidavit. It is perfectly possible that Clark's declarants were wrong or, even if they were correct, that there was nonetheless enough evidence to satisfy the fairly low probable-cause threshold. Clark's family has not created more than "some metaphysical doubt" about whether Strode intentionally or

recklessly included false statements in his warrant affidavit. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is proper.

## Count II: Reckless Investigation

Clark's family argues that Strode's investigation was constitutionally deficient. They face a high bar. "To establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's 'failure to investigate was intentional or reckless, thereby shocking the conscience.'" *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) (quoting *Cooper v. Martin,* 634 F.3d 477, 481 (8th Cir. 2011)). They cannot satisfy this demanding standard for two reasons.

### A.

First, their argument is an improper attempt to refashion their Fourth Amendment claim into a claim under the Supreme Court's judicially created "substantive due process" doctrine. They cite cases—such as *Winslow*, and *Engesser v. Fox*, 993 F.3d 626 (8th Cir. 2021)—that recognize a substantive due process right to be free from investigations that are so inadequate that they "shock the conscience." But unlike *Winslow* and *Engesser*, which both involved criminal convictions, Clark's family's claims concern harm from a search and seizure. Their claims are squarely governed by the Fourth Amendment, so they may not rely on "the more generalized notion of 'substantive due process.'" *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (applying the Fourth Amendment instead of substantive due process). Count II against Strode tries impermissibly to superimpose a "font of tort law" onto the Fourteenth Amendment. *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (citation omitted).

13

## B.

Second, even applying cases like *Winslow* and *Engesser*, Count II still fails.  Because the doctrine of substantive due process is "[u]nmoored from text and history," *Eknes-Tucker v. Governor of Alabama*, 114 F.4th 1241, 1243 (11th Cir. 2024) (Pryor, C.J., respecting denial of rehearing en banc), the Supreme Court has cautioned courts to be "reluctant to expand the concept of substantive due process" beyond boundaries previously identified by the Supreme Court, *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).  Courts have held that the shocks-the-conscience standard is exceptionally demanding.  "Only the most severe violations of individual rights that result from the brutal and inhumane abuse of official power rise to the conscience-shocking level." *Davis v. White*, 794 F.3d 1008, 1015 (8th Cir. 2015) (cleaned up).  The record in this case comes nowhere close to satisfying that demanding standard.

Clark's family argues that Strode's investigation was intentionally or recklessly deficient in several aspects.  They say that Strode failed to corroborate CI2 and CS3's statements.  They argue that because Strode did not know of Clark's physical infirmities, it necessarily follows that Strode's investigation was reckless.  They highlight that Strode saw suspicious activity at 4023 California during only one of the six weeks that he surveilled the 4000 block.  They assert that Strode could have accessed information showing that Clark had previously called 911 about gang activity on the 4000 block, which they think suggests that Clark could not have been a valid target of a search.  In sum, Clark's family argues that Strode had "multiple opportunities to see that the evidence [he was] assembling did not support" the theory that Clark's residence was used to distribute illegal drugs. *See Winslow*, 696 F.3d at 735.

These arguments are far from sufficient for a jury to conclude that Strode's investigation was not only inadequate, but so inadequate that it "shocks the conscience."  The

Eighth Circuit has recognized "that the following circumstances indicate"—but do not automatically establish—"reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id*. at 732 (citation omitted).  There is no evidence in the record that Strode attempted to coerce CI2 or CS3.  There is no evidence of systemic pressure to implicate Clark.

Any facts that suggest that Strode ignored evidence of Clark's innocence do not suggest that he did so recklessly or intentionally.  As established above, a reasonable jury could not infer that CI2 and CS3 were in fact unaware of illegal activity at 4023 California and that Strode knew, or should have known, of this fact.  Nor could a reasonable jury infer that Strode, who observed activity consistent with drug trafficking at Clark's residence, knew or should have known that his surveillance of 4023 California did not corroborate CI2 or CS3's statements.  Also, Clark's family admits that Strode did not know of Clark's physical infirmities, so he could not *purposefully* ignore that evidence.  They suggest that Strode should have done more to learn about these infirmities and to learn that Clark apparently "had called 911 to report activities in the neighborhood." ECF 167 at 27.  But an investigation does not shock the conscience merely because it could have been more thorough or was negligent.  *Cf., e.g.*, *Engesser*, 993 F.3d at 630 ("A failure to ask the right questions and to reconcile inconsistent evidence may be shoddy police work, but in this case, it reflects [at most] nothing more than negligent or grossly negligent conduct."); *Winslow*, 696 F.3d at 732 ("Mere negligent failure to investigate . . . does not violate due process.").

The cases Clark's family cite reveal that Strode's investigation was constitutionally adequate.  In *Winslow*, there was evidence that officers "systemically coached witnesses into

15

providing false testimony that was in line with the narrative of the [officers'] theory." *Id.* at 732–33. Thus, the fact that "no witness could independently provide testimony about the details of the crime" was significant. *Id.* at 736. Additionally, none of the suspects the officers pursued matched the blood type of the sample found at the scene of the crime. *Id.* at 733. The officers refused to let "the discrepancies in the evidence to serve as red flags, . . . instead [they] pressed ahead and continued to exert pressure on vulnerable witnesses to provide testimony that was not within those witnesses' personal memory." *Id*. at 735. Nothing like that is present here. Clark's family identifies no evidence that Strode pressured CI2 or CS3 into implicating Clark, nor that CI2 or CS3 were "vulnerable witnesses" able to be pressured. *Id*. Any flags in this case were pale yellow, if even, not the bright red flag of objective forensic evidence undermining the officer's theory in *Winslow*. An investigation does not shock the conscience merely because it could have been more thorough. And "[d]efendants may not be held liable merely for aggressively investigating the crime, believing witnesses, following leads, and discounting those pieces of evidence that do not fit with the evidence at the scene of the crime." *Id.* at 734.

Similarly, in *Engesser v. Fox*, the Eighth Circuit held that discounting eyewitness testimony, in the face of other evidence, and failing to locate an unavailable witness did *not* constitute purposefully ignoring evidence. 993 F.3d at 630. Strode explained in his warrant affidavit why surveillance of the 4000 block was difficult: he was informed that drug dealers on the block watched the block to locate police. Clark's family identifies no evidence to dispute this assertion. Strode's noticing suspicious activity at 4023 California during only one of his weeks of surveillance and deciding not to try a controlled buy of illegal drugs does not make his investigation reckless. Nothing in the record creates a genuine dispute of

material fact suggesting that Strode intentionally or recklessly failed to investigate Clark

and 4023 California in a way that shocks the conscience.  Summary judgment is proper.

### Count III: Unlawful Authorization of SWAT Team

Clark's family also argues that Strode violated Clark's Fourth Amendment rights by

(1) authorizing SWAT to execute the warrant and (2) requesting a "no-knock" warrant in the

first place.  Neither argument succeeds.

### A.

The first issue is foreclosed by precedent.  The Eighth Circuit has held that as of

September 2017, "it was not clearly established that using a SWAT team to execute a search

warrant, without reason to believe a SWAT team was necessary, violated the Constitution."

*Davis v. City of Little Rock,* 122 F.4th 326, 330 (8th Cir. 2024) (citation omitted).  The search

of 4023 California occurred on February 21, 2017, before September 2017.  Therefore, Strode

did not violate a "clearly established" right of Clark's by authorizing the use of SWAT.

Qualified immunity applies, and summary judgment is proper.

### B.

As to the no-knock claim, Clark's family loses on the facts.  In contrast to their SWAT

claim, it was clearly established in 2017 that the Fourth Amendment protects against at least

some "no-knock" searches, *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995), but Clark's family

fails to meet their burden to create a genuine dispute of material fact.

The question here is whether Strode had reasonable suspicion to believe that exigent

circumstances justified executing the warrant without police first knocking and announcing

their presence.  The warrant did not itself have to "'include a specification of the precise

manner in which [it was] to be executed.'"  *Doran v. Eckhold*, 409 F.3d 958, 964 (8th Cir.

2005) (en banc) (quoting *Dalia v. United State*s, 441 U.S. 238, 257 (1979)).  But police did

need to "have reasonable suspicion of exigent circumstances at the time they execute[d] the

warrant." *Id.* Clark's family has not created a genuine dispute that Strode lacked reasonable suspicion that exigent circumstances justified "no-knock" entry into Clark's residence. *Cf. Der v. Connolly*, 666 F.3d 1120, 1128–29 (8th Cir. 2012) (explaining that plaintiffs bear the burden to prove that it was objectively unreasonable for an officer to believe that exigent circumstances existed).

Clark's family cites Clark's age and what they describe as Clark's lack of criminal history. Using Clark's name and date of birth, Strode searched for information on Clark in the Regional Justice Information System (REJIS) database. The REJIS records revealed that Clark had many arrests, including for violent crimes such as felonious restraint, assault, and unlawful use of a weapon, but the records revealed no convictions. Also, Strode could see that Clark's last arrest was in 2004, about 13 years before the search at issue here. It is undisputed that this is the information Strode saw. Clark's family argues that this evidence is enough to refute any contention that Strode had reasonable suspicion to believe exigent circumstances existed.

But no reasonable jury could make that unwarranted leap based on the evidence in the record. Reasonable suspicion is a low bar, even lower than probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990). To justify the no-knock search, Strode needed reasonable suspicion that officers "knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. . . . This showing is not high." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). The evidence in the record is insufficient to establish lack of reasonable suspicion because, as explained above, it

18

is insufficient to refute the higher standard of probable cause.  Strode had probable cause to believe to believe 4023 California had illegal drugs and firearms, so he necessarily also had reasonable suspicion.

Reasonable suspicion that a residence contains guns, illegal drugs, and a person with a history of arrests for violent offenses is sufficient to justify a no-knock search in this case. The presence of a firearm or a felony drug investigation does not *automatically* justify a no-knock search. *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993) (firearms); *Doran*, 409 F.3d at 962–63 (felony drug investigations).  But felony drug investigations "*frequently* present circumstances warranting a no-knock entry." *Richards*, 520 U.S. at 394 (emphasis added).  More, it is undisputed that Strode knew of Clark's history of arrests for offenses, including violent crimes, and that Strode believed Clark's residence was on a high-crime street where several of Clark's immediate neighbors were involved in drug activity.  Here, Strode had reasonable suspicion that knocking and announcing their presence would be dangerous for officers.

Although none of Clark's arrests led to conviction, and the most recent arrest was about 13 years old, Eighth Circuit precedent is clear that reasonable suspicion of dangerousness can occur even when there is no indication of a criminal record.  In *Doran*, for example, the person challenging the no-knock search emphasized that he had "no prior arrests." *Doran*, 409 F.3d at 964.  That did not matter, the Eighth Circuit said, because (among other things) there still was "reasonable suspicion that an armed and potentially dangerous resident will be present." *Doran*, 409 F.3d at 967 (police received a tip that the plaintiff's son was arrested recently for possessing a sawed-off shot gun).  The Eighth Circuit has determined that even the mere presence of a sawed-off shot gun "in a common area of the house" can justify exigent circumstances. *United States v. Stevens*, 439 F.3d 983, 989

19

(8th Cir. 2006) (no mention of criminal convictions); *see also United States v. Cooper*, 168 F.3d 336, 339 (8th Cir. 1999) (mentioning "violent criminal history" without mentioning whether the plaintiff had been convicted).  As in *Doran*, the officers here had "reasonable suspicion that an armed and potentially dangerous resident will be present."  409 F.3d at 967.

Again, the low threshold for reasonable suspicion is relevant.  Although the arrests may not have led to convictions—perhaps because of problems with witnesses or concerns that the prosecutors could not establish the high bar of proof beyond a reasonable doubt, ECF 137-71 at 9, 11 (noting disposition of charges without conviction because of, among other things, "victim unavailable" and "evidence problems")—a pattern of arrests like Clark's can trigger at least reasonable suspicion of dangerousness.  *E.g.*, *United States v. Huggins*, 299 F.3d 1039, 1047 n.10 (9th Cir. 2002) ("[R]elevant previous arrests may be considered in a probable cause analysis even if no conviction ensued."); *United States v. Zapete–Garcia*, 447 F.3d 57, 61 (1st Cir. 2006) ("[A] series of past arrests might legitimately suggest a pattern of unlawful behavior even in the absence of any convictions.").  Courts sometimes even use a pattern of arrests in the sentencing context, where the standard is preponderance of the evidence, a higher standard than reasonable suspicion or probable cause.  *E.g.*, *United States v. Lozada-Aponte*, 689 F.3d 791, 792 (1st Cir. 2012) (cautioning against reliance in sentencing on a "lone arrest" but noting that a "series of past arrests" can be meaningful).

Finally, Strode's attempts to corroborate (through surveillance) the information provided to him by his sources is meaningful.  The officer in *Stevens* conducted surveillance of the residence and "noted activity consistent with drug trafficking."  *Stevens*, 439 F.3d at 986.  That occurred here, too.  Under the totality of the circumstances, even construing all inferences in favor of Clark's family, Strode is entitled to judgment as a matter of law as to whether he possessed reasonable suspicion sufficient to justify a no-knock search.  Clark's

lack of criminal convictions does not undermine reasonable suspicion that officers knocking and announcing their presence would be futile or dangerous.  At the very least, Clark's family has not established its burden to "identify any law clearly establishing" that the circumstances here fail to justify a no-knock search, so qualified immunity is appropriate even if there was a violation of the Fourth Amendment.  *Davis*, 122 F.4th at 330; *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (citation omitted)).

Clark's family points to Strode's admission that he subjectively had "no information" that Clark was a "violent offender."  ECF 137-32 at 101.  But reasonable suspicion is an objective test, based on what a reasonable officer would believe based on the facts known to the officer.  *United States v. Valencia*, 499 F.3d 813, 816 (8th Cir. 2007).  Although Strode did not know whether Clark was a violent person, a reasonable officer could conclude that the evidence of guns, illegal drugs, and drug distribution at Clark's residence, plus the drug activity at the residences of five of Clark's immediate neighbors, plus Clark's history of arrests supported at least reasonable suspicion.  Likewise, because Strode had no information about Clark's physical infirmities, Clark's health does not factor into a reasonable officer's assessment of Clark's dangerousness.  All Strode knew was Clark's age, but a 63-year-old man can still be dangerous, especially with a gun.  Because reasonable suspicion is a "not high" bar, *Richards*, 520 U.S. at 394, Clark's family fails to create a material dispute about whether Strode possessed reasonable suspicion.  He did.  Summary judgment is proper.

### Count IV: Excessive Force

Clark's family raises three reasons they believe Manasco's conduct was unconstitutionally excessive: (1) his shooting of Clark, (2) the alleged failure to warn, and (3) Manasco's decision to enter the apartment after Clark fired a shot at the officers. None of their arguments prevail.

### A.

Clark's family contends that Manasco acted unconstitutionally when he shot Clark, causing Clark's death. But qualified immunity applies because there is no genuine dispute that Clark pointed a gun (and fired a shot) at Manasco. "An officer's use of deadly force is objectively reasonable against armed suspects who point their gun toward officers." *Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019). Manasco and other officers presented affirmative evidence of Clark pointing a firearm at the officers—their testimony plus hard evidence including a bullet hole, a bullet, and a shell casing at the scene. Against this, Clark's family has failed to "respond by submitting evidentiary materials of specific facts showing the presence of a genuine issue for trial." *Bedford*, 880 F.3d at 997 (cleaned up). On the evidence in this record, no reasonable jury—without resorting to mere speculation—could conclude that Clark was unarmed.

The officers have satisfied their evidentiary burden. *Id*. Multiple officers testified that they heard or felt a shot go by them as they breached the door of 4023 California. Manasco testified that as he entered the threshold, he felt the air moving as the bullet went by. ECF 127-9 at 128. Mueller testified that he heard one shot as the door came open. ECF 136-23 at 3. Moore testified that he heard "a pop" after he breached the door. ECF 136-18 at 2. Photos taken after Manasco shot Clark show a bullet hole in the front door, with a bullet on the other side of the door, and a shell casing next to Clark's body. ECF 137-49. Manasco testified that he saw Clark in the corner of the room, "standing upright and he had a dark-

colored pistol pointed right at me extended from his body."   ECF 127-9 at 129–30. Additionally, Becherer corroborated Manasco's testimony that Clark was holding a gun with his arms extended.  ECF 136-20 at 13.

In light of this evidentiary submission, Clark's family bears the burden of responding with their own evidence sufficient for a jury to reject the officers' contentions. *Bedford*, 880 F.3d at 997.  They have not.  Clark's family points to the evidence of Clark's physical infirmities, including his difficulties raising his arms and carrying items.  The existence of the declarations and health care records about Clark's health are not disputed.  But taken as true, none of the evidence refutes the officers' evidence of Clark's physical ability to raise a handgun.  Clark's family stresses that because Clark is deceased, this Court "must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts."  ECF 134 at 18 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) (alteration in original)).  But the officers' testimony is fully consistent with everything Clark's family cites.  Don Clark, Jr., testified that he helped lift items such as laundry detergent and groceries for his father, but a handgun is not as heavy as those items.  Indeed, Clark's daughter testified that Clark kept the gun under his pillow. ECF 127-4 at 26.  Clark's family's contention that Clark "could not easily hold and lift a gun," ECF 134 at 16, does not make Manasco's testimony internally inconsistent.  More, the conclusory contention by Clark's family that Clark was too infirm to get out of bed and stand in the corner is contradicted by a fact that Clark's family points to, that the position Clark's body was found in "shows he was standing and facing the door."  ECF 137-1 at 19, 20.  Clark's family has failed to provide any evidence that is "significantly probative," so "the state officials are entitled to summary judgment as a matter of law."  *Moody*, 23 F.3d at 1412.

Clark's family also tries to discredit the officers' evidence.  But "[o]nce the movant has supported his or her motion[,] the opponent may not simply rest on the hope of discrediting

the movant's evidence at trial." *Real Property*, 480 F.3d at 844.  True, "[d]eadly force cases pose a unique evidentiary problem because the police officer defendants and their colleagues are often the only surviving eyewitnesses, while the person most likely to contradict their story is dead." *Ludwig v. Anderson*, 54 F.3d 465, 470 n.3 (8th Cir. 1995).  But this Court has no authority to relax the standard evidentiary burden to defeat summary judgment just because it is difficult in these kinds of cases for one side to meet their evidentiary burden.  In any event, the attempt by Clark's family to discredit the evidence falls flat.

First, they emphasize that Becherer moved the gun after Manasco shot Clark.  But Becherer testified that he retrieved the gun because it fell on the edge of the bed next to Clark's body.  ECF 136-20 at 3–4.  Manasco agreed that the gun fell onto the bed.  ECF 127-9 at 132.  That Becherer moved the gun does nothing to contradict the testimony that Clark was standing with the gun in his hands and his arms extended.

Second, Clark's family points to the testimony of the St. Louis Metropolitan Police Department's evidence technician, who appears to have said that bullet casings from the handgun she examined eject behind and to the right (from the perspective of the shooter) if a person is holding the firearm in a certain position.  ECF 136-16 at 2.  Photos show the bullet casing in front of and to the left of Clark's body.  Similarly, Clark's family highlights that furniture in the front room was moved.  Indeed, photos reveal that a small, black table was positioned between Clark and the door, and it was moved before an officer took additional photos of the scene and used a ballistic rod to estimate the trajectory of the bullet Clark allegedly fired as officers breached the door.  Clark's family suggests that the table would have blocked the path of the bullet had Clark fired a shot toward the door from the corner of the room.  *See* ECF 137-49, ECF 137-38; ECF 137-65.

But none of this evidence is sufficient to allow a reasonable jury to conclude that Clark was not standing in the corner pointing his gun when Manasco shot him.  The evidence

technician explained that the direction a bullet casing ejects depends on how a shooter holds the gun.  ECF 136-16 at 3.  The officer who estimated the trajectory of the bullet agreed that the ballistic rod is only a "general estimate" of a bullet's trajectory.  ECF 136-8 at 10.  As to the small table, Clark's family submits no evidence that the table in fact would have blocked Clark's shot; they instead simply speculate that it might have.  Clark's family seems to be suggesting that the officers planted all this evidence after the fact.  But a jury could not so conclude without pure "speculation."  *Moody*, 23 F.3d at 1412.  Clark's family "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012).  They have not.

None of the Eighth Circuit cases that Clark's family cites or that the Court has found defeats summary judgment.  In both *Torres v. City of St. Louis*, 39 F.4th 494 (8th Cir. 2022), and *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009), eyewitness testimony contradicted other evidence in the record.  In *Ludwig*, the only eyewitness testimony was from officers who themselves disagreed about many relevant details of a shooting.  54 F.3d at 473–74.  Whether the shooting was justified depended on whether the decedent (armed with a knife) was close to any bystanders or was moving toward the bystanders or officers with the knife, but "the depositions of the officers [we]re internally inconsistent" on these material issues.  *Id*.  Not so here.  Clark's family notes that Mueller, though he recalled Clark standing in the corner, could not recall if Clark was holding anything.  ECF 136-23 at 4.  But Mueller's inability to remember a detail does not contradict Manasco and Becherer's testimonies that Clark was holding a gun.

Nor is this case like *Gardner v. Buerger*, where the officer's own statements could allow a reasonable jury to conclude that his use of deadly force was unreasonable because he stated that he threatened to shoot the decedent, who was unarmed; that although firearms

25

were in the house, he was told that they were locked in a safe and were inaccessible; and that he shot the decedent in the head. 82 F.3d 248, 250 (8th Cir. 1996).

Finally, in *Partridge v. City of Benton, Ark.*, officers shot a decedent who was threatening suicide. 70 F.4th 489, 490 (8th Cir. 2023). Multiple officers contradicted themselves about whether the decedent pointed a gun at them, and even the testimony of the officer who fired the shot was consistent with the victim not pointing a firearm at the officers. *Id.* at 492. Here, there are no similar contradictions in the officers' testimonies. All the eyewitness testimony is consistent. None of the officers testified that Clark lacked a firearm (unlike in *Gardner*), and two officers clearly testified that Clark pointed a gun.

Also in *Partridge*, a forensic expert testified that it would have been "a very abnormal movement," "a very awkward, highly atypical, unnatural twisting of the wrist" for the victim to point the gun at the officers. *Id.* at 491. Here, none of the forensic evidence contradicts the testimony of the officers, and much physical evidence—such as the position of Clark's body—corroborates their testimonies. The best Clark's family has is the technician's statement that the bullet casing could eject in one direction if the firearm were held a particular way. But that is fully consistent with the officers' testimony. It is pure speculation on the part of Clark's family to say that he must have been holding the firearm in a specific way and that the shell casing could not have rolled or deflected. The evidence cited by Clark's family is woefully insufficient to justify the extraordinary leap Clark's family seeks: that the officers planted all the evidence and lied about what they saw and heard.

Because the Court draws all inferences in favor of the nonmoving party only "*to the extent supportable by the record*," this Court concludes that a reasonable jury could not infer from the evidence in the record that Clark was doing anything other than pointing a gun from the corner of the room. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in

original).  Especially because it is Clark's family that bears the ultimate burden at trial, they "may not simply rest on the hope of discrediting the movant's evidence at trial." *Real Property*, 480 F.3d at 844.  On these facts, Manasco's use of deadly force was reasonable. Summary judgment is proper.

### B.

Clark's family also argues briefly that Manasco gave no warning to Clark before shooting him.  It is also disputed whether the officers shouted "Police" before they breached the door, or as they breached the door, so this Court will view the facts in the light most favorable to Clark's family and conclude that the officers shouted "Police" as they breached. "When a warning is feasible, the failure to warn adds to the unreasonableness of the use of deadly force." *Dimock, Trustee for Heirs of Dimock-Heisler v. City of Brooklyn Center*, 124 F.4th 544, 554 (8th Cir. 2024) (cleaned up).  But the evidence here is that Clark fired at the officers.  In that circumstance, a warning was not feasible.  *See Green v. City of St. Louis*, 134 F.4th 516, 526 (8th Cir. 2025) (explaining that "a warning is less likely to be feasible in a high-pressure situation that requires a split-second judgment" and that "tense, uncertain, and rapidly evolving" situations require "split-second judgments" (citation omitted)).

True, use of force following a threat can become unreasonable when "an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force." *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020).  But Clark's family is unable to present any evidence that the threat was extinguished.  The record is unclear as to how many seconds passed between Manasco entering 4023 California, seeing Clark, and shooting.  *See* ECF 136-23 at 3–4 (officer providing equivocal testimony about whether 15 seconds elapsed between Manasco entering the residence and Manasco shooting).  Although "a few seconds" sometimes "is enough time to determine an immediate threat has passed,"

*Hutchins*, 959 F.3d at 1134, Clark's family identifies no case suggesting that an immediate threat can pass so quickly when a suspect has already fired a shot at officers and is actively pointing a gun at officers. *Contra id.* (observing that "a person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion").

At the very least, Manasco is entitled to qualified immunity because the right at issue here was not clearly established. Clark's family bears the burden to demonstrate that the law was clearly established. *Monroe v. Ark. State Univ.,* 495 F.3d 591, 594 (8th Cir. 2007). For a right to be clearly established, "existing precedent must have placed the . . . constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). "Specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (cleaned up). Clark's family identifies no factually similar case. *See Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002) ("To demonstrate the law is 'clearly established' the plaintiff must show that a 'reasonable official would understand that what he is doing violate[s]' plaintiff's rights.") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Wesby*, 583 U.S. at 63–64 (explaining that while there does not have to be "a case directly on point" for every reasonable officer to know he is violating a right, there must be "controlling authority" or "a robust consensus of persuasive authority" and the "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply" (cleaned up)).

## C.

Finally, Clark's family argues that Manasco was objectively unreasonable in entering 4023 California after he felt what he believed was a bullet fly by him. The Supreme Court,

28

in *Barnes v. Felix*, 605 U.S. 73, 80 (2025), reaffirmed that events that occurred before the moment of a shooting are part of the "totality of circumstances" assessed in determining whether use of force was objectively reasonable.  But that case did not address whether an officer choosing to enter a residence makes his later use of deadly force objectively unreasonable.  And Clark's family cites no precedent establishing that it is a Fourth Amendment violation for an officer to enter a residence after a shot is fired from within the residence.  Clark's family fails to cite either a "controlling authority" or a "robust consensus of cases of persuasive authority" that clearly established the right Manasco allegedly violated.  *Wesby*, 583 U.S. at 63.  Clark's family does not satisfy their burden to demonstrate that it was clearly established that Manasco's decision to enter 4023 California made his later use of deadly force a violation of the Fourth Amendment.  Qualified immunity applies. Summary judgment is proper.

## Count VIII: Wrongful Death

Official immunity applies to the claim against Strode for wrongful death under Missouri law, Mo. Rev. Stat. § 537.080.  Under Missouri law, official immunity shields public officials from liability in their individual capacities "for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts."  *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 494–95 (Mo. 2024) (citation omitted).  Official immunity does not apply "when a public official acts in bad faith or with malice."  *Id.* at 495. Bad faith or malice requires "actual intent to cause injury."  *Id.* at 496.  More, "official immunity applies to recklessness to the same extent as negligence."  *Id.* at 497–98.  Clark's family argues that a jury could conclude that Strode intentionally included falsehoods in his warrant affidavit.  But a reasonable jury could not infer that Strode even recklessly included false statements in his warrant affidavit, let alone intentionally.  Because Strode did not act

29

in bad faith or with malice, intending to injure Clark, official immunity applies.  Summary judgment is proper.

### Count VI: Municipal Liability

Clark's family also sues the City of St. Louis.  A municipality "may be liable under § 1983 for constitutional violations if a violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Leftwich ex rel. Leftwich v. Cnty. of Dakota*, 9 F.4th 966, 972 (8th Cir. 2021) (citation omitted). Specifically, Clark's family alleges that the City of St. Louis had a policy and custom of using SWAT to execute virtually all drug-related search warrants.  Clark's family argues that a formal police department policy, SLMPD Special Order 8-02, requires employees to violate the Fourth Amendment's reasonableness requirement.  And Clark's family argues that the City of St. Louis failed to train officers about how to properly decide when to use SWAT to execute search warrants.  Each theory fails.

### A.

Start with their contention that Special Order 8-02 itself is facially unconstitutional. Municipal liability can arise when a municipal policy "itself violates federal law, or directs an employee to do so."  *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 992 (8th Cir. 2015); *cf. Moody v. NetChoice*, 603 U.S. 707, 723 (2024) (describing facial challenges as "hard to win" and explaining that a "plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid" (cleaned up)).  Clark's family presses two arguments on this front.  Each fails.

First, Clark's family argues that Special Order 8-02 requires officers to violate the rule in *Richards v. Wisconsin*, 520 U.S. at 392, that a felony drug investigation does not automatically permit no-knock searches.  In support, they note that the police department policy states that "[i]f a search warrant is to be executed, and one or more of the following

criteria is met, SWAT will be utilized to execute the high risk search warrant." ECF 136-17 at 13.

But none of the "criteria" stated in the policy concerns drug-related searches. They instead concern, among other things, the search target "ha[ving] a violent history," "fortifications" that cannot be defeated without use of a SWAT team, and "the mention of weapons in the offender's possession or in the target residence." *Id.* The SLMPD's designee witness testified that the policy does not automatically require the use of SWAT in drug investigations, even though he thought that in practice drug investigations were dangerous and justified SWAT. ECF 136-7 at 25. True, as Clark's family notes, the special order includes a catchall provision authorizing use of a SWAT team if "any other intelligence information received and/or situation exists where the investigating unit feels that they cannot safely execute the search warrant." ECF 136-17 at 13. But this open-ended provision does nothing other than to allow officers to make the individualized assessments that the Fourth Amendment requires.

Second, Clark's family argues that Special Order 8-02 mandates using SWAT teams to execute warrants whenever one of the "criteria" listed in the policy occurs. They mention that one of the criteria is the search target possessing a weapon. And they assert that the policy mandates use of a SWAT team every time the target possesses a weapon, thus contravening the rule under the Fourth Amendment that use of force must be assessed on a case-by-case basis. *See Z.J. by and through Jones v. Kansas City Bd. of Police Comm'rs*, 931 F.3d 672, 688 (8th Cir. 2019) ("An officer's decision to authorize a SWAT team to execute a warrant can, in some cases, constitute a Fourth Amendment violation.").

That argument focuses on one policy without considering a neighboring document that lends clarity. Special Order 8-02, the document Clark's family focuses on, discusses criteria that may lead officers to conclude that "a search warrant is high risk." ECF 136-17 at 13.

31

But Clark's family wrongly thinks the policy compels use of a SWAT team in all high-risk situations. Another order, Special Order 5-18, clarifies that a "[h]igh risk warrant" situation "*could* justify a SWAT response," not that a SWAT response is automatic. ECF 127-6 at 8 (emphasis added). That latter order makes clear that officers faced with a high-risk warrant situation should consider the "totality of the[] unique circumstances" because "[t]he unique circumstances that constitute each individual situation make it impractical" to set categorical rules. *Id*. Read together, these policies at most state that a search target possessing a weapon can make a warrant situation "high risk" and that a SWAT team "could" be used in that situation if, in the judgment of the lead officer, the totality of the circumstances justifies it. That is not facially unconstitutional.

Even focusing only on Special Order 8-02 in isolation, it is far from clear that the policy would automatically mandate use of a SWAT team whenever any enumerated criteria is present. It vests discretion with the "primary investigator in conjunction with the SWAT commander" to "determin[e] if a search warrant is considered high risk." ECF 136-17 at 13. And if those two officials disagree, then "the Commander of Support Operations will make the final determination." ECF 136-17 at 13. This language, which acknowledges the possibility of disagreement between officers, is consistent with a case-by-case analysis of whether, even if one of the criteria is met, a warrant is in fact "high risk" enough to require use of a SWAT team. "A municipality's policy of leaving the decision of whether and how to use force to the individual officer's discretion is not an unconstitutional policy." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1257 (8th Cir. 2023) (citation omitted). Special Order 8-02 does not "affirmatively sanction" unconstitutional conduct, so it is not facially unconstitutional. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390–91 (8th Cir. 2007) (en banc).

Both arguments by Clark's family also fail because the arguments conflate no-knock searches with SWAT searches. Relying on *Richards*, they argue that a felony drug

investigation does not automatically permit no-knock searches.  And relying on *Marts*, they argue that the mere presence of a firearm does not automatically justify a no-knock search.  But no-knock searches are not coterminous with use of SWAT teams, so Clark's family cannot use no-knock cases to attack a policy about SWAT use.  SWAT teams regularly conduct searches by knocking and announcing.  *See, e.g.*, *Z.J.*, 931 F.3d at 688 ("detectives would have expected the SWAT team officers to knock and announce their presence"); *United States v. Leonard*, 210 F.3d 376 (7th Cir. 2000) ("[A]pproximately 15 seconds after the second knock and the first announcement, the SWAT team broke the door down using the battering ram."); *Keten v. Mosey*, No. 11-cv-1520, 2013 WL 870378, at *1 (D. Minn. Mar. 8, 2013) ("The SWAT team arrived around 9:00 a.m. to execute a knock and announce, daytime warrant.").  The citations to *Richards* and *Marts* are inapposite because Clark's family sues a municipality over the separate (albeit sometimes related) issue of authorizing SWAT teams.

Conflating no-knock searches with use of SWAT teams also fails because there is no indication that the use of a SWAT team inherently requires certain tactics in this police department.  An officer who authorizes use of a SWAT team is "not automatically responsible for all of the actions of the SWAT team officers."  *Z.J.*, 931 F.3d at 688.  Instead, an officer can be held liable for authorizing a SWAT team if "the display of force *inherent* in the deployment of the SWAT team—the force invoked by the *decision* to deploy—was excessive under Fourth Amendment standards."  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1191 (10th Cir. 2001) (first emphasis added) (cited in *Z.J.*, 931 F.3d at 688).  Unlike with other SWAT teams, there is no evidence that any particular use of force was inherent in the use of this SWAT team and every indication that the SWAT team had discretion to make real-time judgment calls about whether and how much force to use.

**B.**

Clark's family also argues that even if the policy is not facially unlawful, it is unlawful as applied and that the city also had an unconstitutional custom.[4]  But Clark's family acknowledges that the standard that they must prove here is "deliberate indifference."  ECF 134 at 23, 27.  And the Eighth Circuit has squarely held that a municipality cannot be deliberately indifferent to the violation of a legal right if the right is not clearly established. That resolves this argument.

Where, as here, the injuries are indirectly imposed by agents of the municipality, claims about policy and claims about custom both require proving "deliberate indifference" to unlawful conduct.  *E.g.*, *Szabla*, 486 F.3d at 390 ("'[A] plaintiff seeking to establish municipal liability on the theory that a *facially lawful* municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'" (quoting *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997)); *Cartia v. Beeman*, 122 F.4th 1036, 1045 (8th Cir. 2024) (explaining that one element of a "custom" claim under *Monell* is "deliberate indifference to or tacit authorization" of unlawful conduct), *cert. denied sub nom. Adams v. Gugliano*, 145 S. Ct. 2777 (2025); *Johnson v. Douglas Cnty. Medical Dep't*, 725 F.3d 825, 829 (8th Cir. 2013) (equating deliberate indifference with tacit authorization).

This requirement is fatal to Clark's family's claims because a municipality cannot be "deliberately indifferent" to the violation of a right if the right is not clearly established.  As the Eighth Circuit put it, "a deliberate indifference claim fails in the absence of clearly established constitutional rights, so-called 'clear constitutional guideposts' for municipalities

---

[4] The parties dispute whether the Court previously dismissed that claim before this case was reassigned to a new judge.  ECF 71 at 27.  Even accepting, for the sake of argument, that this claim was not dismissed, summary judgment is proper here.

in the area." *Lombardo v. City of St. Louis*, 38 F.4th 684, 692 (8th Cir. 2022) (cleaned up); *Szabla*, 486 F.3d at 393 ("[W]e agree with the Second Circuit and several district courts that a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." (emphasis in original)).   Clark's family attempts to distinguish between deliberate indifference to a constitutional right and deliberate indifference to unconstitutional misconduct.   But deliberate indifference is part of the "rigorous standards of culpability and causation" that "must be applied" when a municipality has not directly caused an injury; otherwise, a plaintiff would be able to skirt the prohibition on holding a municipality liable on a *respondeat superior* theory.   *Szabla*, 486 F.3d at 390, 394.   Given the overlapping nature of the types of municipal liability, this Court cannot conclude that "deliberate indifference" is a lower standard of fault for customs than it is for policies or failure to train.   *See, e.g.*, *Perkins v. Hastings*, 915 F.3d 512, 521 (8th Cir. 2019) ("To establish a municipal custom based on a failure to prevent police misconduct, a plaintiff must show that the municipality acted with deliberate indifference to the rights of persons with whom the officers come into contact.").   Because the right that the Clark family asserts about the use of SWAT teams was not clearly established in 2017, the municipality could not have adopted a policy or custom that was deliberately indifferent to the violation of that right.

Likewise, any claim by Clark's family for failure to train officers also fails, because failure to train requires the plaintiff to show "that the municipality acted with deliberate indifference to the rights of persons with whom the officers come into contact." *Partridge v. City of Benton, Arkansas*, 157 F.4th 970, 973 (8th Cir. 2025).   Because Strode's authorizing use of a SWAT team did not violate any right that was clearly established, the City of St. Louis is not liable for failure to train.

Against this, Clark's family invokes a line of cases about how lack of individual liability does not necessarily preclude municipal liability. The Eighth Circuit has frequently said that "for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). The Eighth Circuit recently clarified that this is not always true. Although that is the "general rule," sometimes "a municipality may be held liable for its unconstitutional policy or custom even when no official has been found personally liable for his conduct under the policy or custom." *Webb v. City of Maplewood*, 889 F.3d 483, 486 (8th Cir. 2018).

This line of cases is consistent with the holding that the absence of a clearly established right precludes municipal liability where liability requires deliberate indifference. *Webb* recognized a different situation involving not qualified immunity—which is never mentioned in that decision—but instead "absolute immunity" such as "legislative" immunity. *Id.* at 487. *Webb* concluded that a municipality can be liable for an unconstitutional policy adopted by legislators who have absolute immunity. *Id.* Deliberate indifference is not required for those kinds of claims. Here, in contrast, Clark's family acknowledges that deliberate indifference is required, and Eighth Circuit precedent forecloses deliberate indifference unless the right at issue was clearly established.[5]

## Conclusion

Summary judgment is proper for all counts.

---

[5] The Court recognizes some tension in the doctrine. In a recent decision, the Eighth Circuit concluded that a right was not "clearly established" but then proceeded to assess (and reject) the claim that a "'policy or custom' was to blame." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023). This decision could be read to suggest that the deliberate indifference standard does not require a right to be clearly established. But *Leonard* is less clear on the point than *Lombardo* and *Szabla*, and *Leonard* does not assess either of those two decisions. The Court thus applies *Lombardo* and *Szabla*.

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED**.  ECF 125.  All other motions are dismissed as moot.  ECF 122; ECF 128; ECF 228; ECF 232.

Dated this 13th day of February, 2026

_____
JOSHUA M. DIVINE
UNITED STATES DISTRICT JUDGE